STATE OF CONNECTICUT, DEPART-
MENT OF TRANSPORTATION,
Plaintiff,

v.

CONSOLIDATED RAIL
CORPORATION,
Defendant.

Civ. A. No. 84–7.

Special Court,
Regional Rail Reorganization Act.

July 30, 1984.

Mark S. Shipman, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for ·plaintiff Conn. Dept. of Transp.

Ralph G. Wellington, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant Consol. Rail Corp.

Before GASCH, Presiding Judge, and BRYANT and WEINER, Judges.

## MEMORANDUM AND ORDER

GASCH, Presiding Judge.

Suit was filed by plaintiff, State of Connecticut, Department of Transportation ("CDOT"), on July 16, 1984, seeking preliminarily and permanently to enjoin defendant, Consolidated Rail Corporation ("Conrail"), from disposing of its property, identified as 54 Meadow Street, New Haven, Connecticut, a nine-story office building (the "Building"). CDOT also seeks a mandatory injunction ordering Conrail to convey title to the Building to it without consideration. Together with its complaint CDOT filed an application for a preliminary

injunction and, on July 23, 1984, filed a *lis pendens.* Conrail filed a motion to dismiss the action and to release the *lis pendens* as well as an opposition to CDOT's request for preliminary injunction. The need for expedition being clear because the date set for the sale of the Building is July 31, 1984, oral argument on the motions was heard on July 27, 1984.[1]

At the outset of the oral argument in open court, counsel for CDOT sought permission to call witnesses, stating that there was a conflict between the affidavits offered by Conrail and those offered by CDOT·and that there was involved a question of credibility. Counsel was allowed to make a proffer as to what his evidence would show. Upon consideration of the proffer and the prior representations of the parties, as subsequently set forth in this memorandum, the Court denied the request for an evidentiary hearing. Counsel also moved for a temporary restraining order but since there was pending before the Court a motion for preliminary injunction, the Court concluded that it was unnecessary to hear counsel on a temporary restraining order.

Briefly, the pertinent facts are as follows. The Building is near the old New Haven Railroad Station. It was formerly the property of the New York, New Haven and Hartford Railroad and then its successor, the Penn Central Transportation Company ("Penn Central"). On April 1, 1976, the Building was conveyed by Penn Central to Conrail pursuant to Section 303(b) of the Regional Rail Reorganization Act of 1973 ("RRR Act"). Conrail provided both freight and commuter rail service over the New Haven line from April 1, 1976 through December 31, 1982, as required by the RRR Act, and used the Building as its Northeastern Region headquarters. During that period of time well over one half of the occupants of the Building were engaged in the operation of Conrail's freight business. A smaller number of occupants were engaged in Conrail's commuter rail

---

1. Due to the extremely short notice and a scheduling conflict, Judge Weiner was unable to hear the argument. With the consent of the parties, he has participated in the decision.

service. At least 75 percent of the Building's occupied floor space was devoted to Conrail's freight service. Effective January 1, 1983, Conrail was relieved of its commuter rail service obligations over the New Haven line by Section 1136 of the Northeast Rail Service Act of 1981 ("NRSA"). CDOT and the Metropolitan Transportation Authority ("MTA") elected to contract with Metro-North Commuter Railroad Company ("Metro-North") to operate commuter rail service on the New Haven line effective on January 1, 1983.

In order to facilitate the transfer of the commuter rail service from Conrail, Congress in Section 506 of the Rail Passenger Service Act ("RPSA") as enacted by Section 1137 of NRSA, provided for the transfer of rail properties to commuter authorities such as CDOT. Section 506(b) provides for a commuter authority to initiate negotiations with Conrail to effect the transfer of commuter rail service. In 1982 CDOT, being a commuter authority as defined by Section 1135(a)(3) of NRSA, and Conrail commenced Section 506(b) negotiations. During these negotiations CDOT attempted to secure the transfer of the Building on the ground that Conrail was phasing out the use of the Building in its freight operations and that the Building would be used or useful now, and in the future, in CDOT's operation of commuter service on the New Haven line. The parties were unable to reach agreement. On September 17, 1982, Conrail advised CDOT that it would not transfer the Building. By agreement of the parties the matter was submitted to a panel of arbitrators appointed by the Secretary of Transportation. In its written presentation to the arbitrators, CDOT stated its need for the Building and further asserted that: "Conrail has publicly stated that they will be terminating or transferring employees presently assigned to this facility by the end of 1982." Before the arbitrators were able to act, CDOT and Conrail settled their dispute over disposition of the Building. The settlement provided that CDOT would have a three-year lease on three floors of the Building to house its commuter operations employees

for a rent of one dollar per year. On May 9, 1984, more than a year after the settlement, Conrail entered a contract with a third party to sell the Building for $2.5 million, subject, however, to CDOT's lease.

CDOT now claims that it agreed to settle its claim for the Building in return for the three-year lease because it was intentionally misled as to Conrail's future plans to use the Building for freight operations and, therefore, that the settlement should be set aside. If the settlement is set aside, CDOT contends that Conrail should be required to transfer the Building to it because the Building is a rail property "used or useful" in commuter rail service, and not one used chiefly in freight service. For this contention, CDOT relies on Sections 506(b), (c) and (i) of RPSA. These sections provide in pertinent part:

(b)(1) A commuter authority may initiate negotiations with Conrail for the transfer of commuter service operated by Conrail.

(2) Any transfer agreement between such a commuter authority and Conrail shall specify at least—

(A) the service responsibilities to be transferred;

(B) the rail properties to be conveyed; and

(C) a transfer date not later than January 1, 1983.

(3) Any transfer agreement under this subsection shall be entered into not later than September 1, 1982.

(c) Not later than September 1, 1982, Conrail and Amtrak Commuter shall agree on terms and conditions for the transfer to Amtrak Commuter of all of Conrail's commuter service in the Northeast Corridor, except for commuter service to be transferred directly to a commuter authority under an agreement entered into under subsection (b) of this section, and any rail properties used or useful for the operation of such commuter service. Such service and properties

shall be transferred to Amtrak Commuter not later than January 1, 1983.[2]

\* \* \* \* \* \*

(i) Conrail shall retain rail properties which are used chiefly in freight service and appropriate trackage rights for freight operations over any rail properties which are transferred under this section. Any dispute regarding such rights may be submitted to the Commission for final and binding determination.

In its opposition to CDOT's motion for preliminary injunction and its own motion to dismiss, Conrail disputes CDOT's interpretation of these provisions, and argues that, in any case, Section 507 of RPSA precludes judicial review of the transfer of rail properties pursuant to agreements negotiated under Section 506.[3] Moreover, Conrail has presented affidavits establishing that at the time the matter was submitted for arbitration, and at all times prior to January 1983, it used the major portion of the occupied space of the Building for its freight operations and that its freight employees outnumbered its commuter employees in the Building.

CDOT does not dispute that the majority of the occupied space in the Building was used in Conrail's freight service, but claims that Conrail concealed its intention to cease freight operations in the Building and if that intention had been known CDOT would not have consented to remove the dispute regarding the Building from arbitration. CDOT seeks to establish the effect of the alleged misrepresentation by the affidavit of William J. Lynch, Director of Rail Operations for the State of Connecticut. Lynch states that absent Conrail's representation that it needed and intended to use the Building in the future, CDOT would have pursued its efforts to obtain the Building and not settle the dispute.

■ CDOT's claim of misrepresentation fails on two counts. Any Conrail statements as to future use of the Building should not have misled CDOT. Mr. Lynch knew, or should have known, that CDOT itself had stated in writing to Conrail when identifying properties to be transferred and in its written submission to J. Stewart Warden, one of the arbitrators, and in its submission to the arbitration panel, that Conrail had publicly stated it would either be terminating or transferring employees presently assigned to the Building by the end of 1982. It thus appears that CDOT's own representations prior to the settlement that it well knew of Conrail's ultimate plan to destroy the evidentiary value of the Lynch affidavit that such information was fraudulently withheld from CDOT. Of equal significance in this regard is that paragraph 21.1(d) of the lease agreement specifically allows Conrail to enter and exhibit the Building to prospective purchasers at any time during the term of the lease. *See* Conrail Exhibit L, p. 14.

■ CDOT's misrepresentation claim also fails because CDOT has misread the statute. We find nothing in Section 506(b) to require the transfer of any particular rail properties and CDOT's reliance on Section 506(c) is misplaced. That subsection deals only with transfer agreements between Conrail and Amtrak Commuter. Although the guidance in Section 506(c) regarding the transfer of "any rail properties used or useful for the operation of such commuter service," may have some applicability to the identification of and negotiations regarding rail properties undertaken pursuant to Section 506(b), Section 506(b) merely requires a process of negotiation. It does not mandate what rail properties are to be transferred. Moreover, it is clear from the record that the Building was

2. Amtrak Commuter, mentioned in the Act, refers to Amtrak Commuter Services Corporation, which never operated commuter rail service on The New Haven Line because CDOT and MTA contracted with Metro-North.

3. Section 507 of RPSA provides:

Transfers of properties and assumptions of service responsibilities pursuant to agreements negotiated under section 506, or pursuant to a determination made by the Secretary under section 506(d) or (f), shall not be subject to judicial review or to the provisions of subtitle IV of title 49, United States Code.

chiefly used for freight service at all times prior to 1983. Therefore, under Section 506(i), the Building was excluded from transfer to CDOT in any case. A subsequent change of use is not relevant to the transfer of rail properties under the statute. An alleged misrepresentation regarding future use of the Building could not have affected CDOT's rights under Section 506. It thus appears that CDOT has failed to establish a basis for preliminary injunctive relief because it has failed to demonstrate any likelihood that it will succeed on the merits of its case. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977); *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958).

■ The Court also concludes that Conrail's motion to dismiss should be granted. The parties agreed that the decision of the arbitrators appointed by the Secretary of Transportation was to be final. That agreement is unreviewable under Section 507. Before the arbitrators could reach a decision, however, CDOT decided to settle its claim to the Building. The Secretary of Transportation has determined that this settlement is conclusive on the parties. We agree. As discussed, CDOT's contention that there were fraudulent misrepresentations by Conrail is without merit. Its own representations to the arbitration authority reveal that all parties knew that it was the ultimate plan of Conrail to dispose of the Building. The settlement agreement effected voluntarily by the parties while the matter was under binding arbitration is not affected by the sale of the Building. Under these circumstances, the motion to dismiss is granted because "it appears beyond doubt that [CDOT] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

Accordingly, it is this 30th day of July, 1984,

ORDERED that CDOT's motion for a preliminary injunction be, and hereby is, denied; and it is further

ORDERED that Conrail's motion to dismiss be, and hereby is, granted; and it is further

ORDERED that CDOT shall release forthwith the *lis pendens* filed as a consequence of this action.